IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| JAIMIE L. HOOVER, | CASE NO. 3:25-cv-2543 |
| Plaintiff, | DISTRICT JUDGE<br>JAMES R. KNEPP II |
| vs. | |
| COMMISSIONER OF SOCIAL<br>SECURITY ADMINISTRATION, | MAGISTRATE JUDGE<br>JAMES E. GRIMES JR. |
| Defendant. | **REPORT &<br>RECOMMENDATION** |

Plaintiff Jaimie Hoover filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying disability insurance benefits. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The Court referred this matter to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the District Court affirm the Commissioner's decision.

**Procedural history**

In September 2022, Hoover filed an application for disability insurance benefits, alleging a disability onset date of April 1, 2019.[1] Tr. 17, 41–42. In her

---

[1]     "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006). Hoover's original onset date was in January 2020, but she amended this date to April 1, 2019. Tr. 17, 41–42.

application, Hoover claimed that she was disabled due to diabetes, left leg amputation, anoxic brain injury, bipolar disorder, anxiety, depression, speech impairment, memory loss, vision loss, and cardiac arrests. Tr. 226. The Social Security Administration denied Hoover's application and her motion for reconsideration. Tr. 71, 80. Hoover then requested a hearing before an Administrative Law Judge (ALJ). Tr. 109.

In December 2024, an ALJ held a hearing, during which Hoover and a vocational expert testified. Tr. 36–70. The next month, the ALJ issued a written decision finding that Hoover was not disabled. Tr. 17–30. The ALJ's decision became final on October 14, 2025, when the Social Security Appeals Council declined further review. Tr. 1–3; *see* 20 C.F.R. § 404.981.

Hoover filed this action on November 21, 2025. Doc. 1. She asserts the following assignments of error:

> 1. Did the ALJ err at step two (2) and step four (4) by failing to include plaintiff's anxiety, bipolar, and/or depression as a severe impairment, and thereafter not explaining why related non-exertional limitations were excluded from the final RFC?
>
> 2. Did the ALJ err at step four (4) in finding … Mrs. Case's opinion unpersuasive?
>
> 3. Did the ALJ err … by finding occupations available without properly considering the issues of absenteeism at step four (4)/step five (5)?

Doc. 10, at 1.[2]

---

[2]    In her reply brief, Hoover withdraws her third issue regarding absenteeism. Doc. 12, at 7. So I don't evaluate issue three.

**Evidence**

*Personal and vocational evidence*

Hoover was 27 years old on her date last inured. Tr. 29. She completed the twelfth grade and last worked in 2021, part-time at a convenience store. Tr. 42–43, 227.

*Relevant medical evidence*[3]

Hoover's date last insured[4] is March 31, 2020, which means that she has to show that she became disabled between April 1, 2019 and March 31, 2020.[5] *See Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990).

A year before her alleged disability onset date, Hoover saw Certified Nurse Practitioner Felicia Fior-Nossek to be evaluated for anxiety and depression. Tr. 2739. Hoover also complained of daily, random mood swings and intermittent anger. Tr. 2739. She said that for over a year she had been taking the medication Zoloft, which was initially prescribed for post-partum depression. Tr. 2739. The Zoloft helped Hoover's depression and her

---

[3] Hoover only challenges the ALJ's decision as to her mental limitations. Doc. 10, at 2. So I only summarize and discuss the mental health evidence in the record.

[4] To be entitled to disability insurance benefits, a claimant must be a wage-earner who accumulated sufficient earning credits and became disabled before the end of his or her insured date. *See, e.g.*, 42 U.S.C. § 423(c)(1); *see also Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988); Soc. Sec. Disab. Claims Prac. & Proc. § 5:3 (2nd ed. 2022).

[5] Hoover says that she applied for, and was awarded, supplemental security income beginning after her date last insured, Doc. 10, at 4, and presumably after she suffered a severe medical event in March 2021.

intermittent anxiety. Tr. 2739. Hoover also smoked marijuana occasionally to help with her anger. Tr. 2740. She denied psychotic symptoms or suicidal thoughts. Tr. 2740. She reported sleeping little and having a lot of energy. Tr. 2739. Hoover said that she started fights with her family, spent money impulsively and needlessly, engaged in risky behavior, and had difficulty focusing and concentrating. Tr. 2739. Depression screening indicated that Hoover had moderately severe depression. Tr. 2739. On exam, her mood was irritable, anxious, and depressed. Tr. 2742. She had rapid, talkative, and spontaneous speech and fair impulse control. Tr. 2742. Her insight was "good-fair." Tr. 2742. Hoover's remaining exam findings—appearance, affect, behavior, attention, judgment, thought content and process, and memory— were normal or unremarkable. Tr. 2741–42. Fior-Nossek assessed Hoover with bipolar affective disorder, panic disorder, and generalized anxiety disorder. Tr. 2742. She adjusted one of Hoover's medications and added two other medications. Tr. 2742.

At a September 2018 follow-up appointment with Fior-Nossek, Hoover explained that she hadn't followed up since her April visit because her insurance ran out. Tr. 2743. Hoover said that she continued to take Zoloft, but ran out of her other medications. Tr. 2743. On exam, Hoover's exam findings were the same as her April visit. Tr. 2745. Fior-Nossek refilled Hoover's medications and referred Hoover for counseling. Tr. 2745.

4

At a November 2018 follow-up, Hoover said that her depressive symptoms were under control and her anxiety symptoms were "fair." Tr. 2747. She reported feeling hypomanic. Tr. 2747. Hoover's exam findings showed an anxious, hypomanic mood, and her remaining findings were the same as her prior visit. Tr. 2749. Fior-Nossek adjusted Hoover's medications. Tr. 2749. Later that month, Hoover told Fior-Nossek that she had experienced a manic episode but felt "fine now." Tr. 2750. Her exam findings were the same as her prior visit, except that her speech was pressured, rapid, talkative, and spontaneous. Tr. 2752. Fior-Nossek advised Hoover to notify her if she experienced a manic episode and adjusted her medications. Tr. 2753.

In January 2019, three months before the alleged onset date, Hoover's depression score was zero and she reported experiencing no mental health symptoms. Tr. 2754. Hoover told Fior-Nossek that her depression, anxiety, anger, and irritability were all "under control." Tr. 2754. On exam, Hoover was well-groomed and fully oriented. Tr. 2755. She had good abstraction; a bright, appropriate, and full-range affect; good attention; good-to-fair insight; fair impulse control; average intelligence; good judgment; and a happy mood. Tr. 2755. Hoover had unremarkable thought content, intact thought process, and intact memory. Tr. 2756. Her speech was pressured, rapid, talkative, and spontaneous. Tr. 2756. She said that marijuana calmed her down. Tr. 2755. Fior-Nossek adjusted Hoover's medications. Tr. 2756.

In February 2019, Hoover told Fior-Nossek that she stopped taking all of her mental health medications, other than Zoloft, because she was pregnant. Tr. 2757. On exam, her speech was no longer pressured or rapid and her mood was euthymic.[6] Tr. 2759.

In April 2019, a week after Hoover's alleged onset date, Hoover was admitted to the hospital for vomiting and abdominal pain. Tr. 422. She denied sleeping problems, irritability, mood swings, and depression. Tr. 422. On exam, Hoover was cooperative, and had an appropriate affect, normal judgment, and "normal psychiatric thoughts." Tr. 423. In May 2019, Hoover returned to the hospital for nausea and vomiting, Tr. 471, and was again described as cooperative with an appropriate mood and affect, Tr. 477. At a similar hospital visit in June 2019, she was also described as alert and cooperative. Tr. 495.

Hoover delivered her child in late September 2019. Tr. 1899

In December 2019, Hoover went to the emergency room complaining of abdominal pain and nausea. Tr. 511. She was alert, cooperative, and exhibited normal speech. Tr. 511.

About two weeks later, Hoover saw Certified Nurse Practitioner Cassandra Case for a follow-up from her abdominal-pain related emergency room visit and for an annual exam. Tr. 318. Hoover said that her abdominal pain had improved. Tr. 318. Nevertheless, she reported experiencing

---

[6]    A euthymic mood is tranquil, neither depressed nor manic. *See* Dorland's Illustrated Medical Dictionary 647 (33rd ed. 2020).

6

abdominal pain the day of her visit that she believed was from her "uncontrolled anxiety." Tr. 318. Hoover explained that she had stopped taking mental health medications due to her pregnancy, and she "want[ed] to talk about her medications." Tr. 318. She also advised that she "want[ed] to call Felicia [Fior-Nossek]'s office to make an appointment." Tr. 318. On exam, Hoover was alert, oriented, and cooperative. Tr. 319. Her affect was flat and she appeared anxious. Tr. 319. She had good eye contact, clear speech, unremarkable thought content, and a logical, goal-directed thought process. Tr. 319. Case commented that Hoover "ha[d] previously been on Zoloft 200mg with Lamicital and Seroquel" and "will make an app[ointmen]t with Felicia." Tr. 319. Case increased Hoover's Sertraline dosage "to help improve her symptoms … until she can get an appointment with psychiatry." Tr. 319.

In early January 2020, Hoover went to the emergency room for abdominal pain, nausea, and vomiting. Tr. 517. She was described on exam as cooperative, alert, and oriented, with normal speech and an appropriate mood and affect. Tr. 518, 531. Hoover returned a week later with similar symptoms, denied sleeping problems, and was described on exam as cooperative with a tearful affect due to her pain complaints. Tr. 559–60. Regarding her bipolar disorder, Hoover "implied that she does have a scheduled appointment with Felicia for reevaluation." Tr. 563.

In February 2020, Hoover went to the emergency room for nausea, vomiting, and hyperglycemia. Tr. 595. On exam, she was alert, oriented,

pleasant, and cooperative, and had an appropriate affect and good judgment. Tr. 596.

In March 2020, Hoover was admitted to the hospital for diabetic ketoacidosis and vomiting. Tr. 617. On exam, she was cooperative and had clear and coherent speech and an appropriate mood and affect. Tr. 621. Hoover said that she had not followed up with her psychiatrist "in a while" and that she had taken herself off two medications "since [September] 2019." Tr. 617–18. The doctor "suspect[ed] her bipolar disorder [wa]s playing a significant role in overall care/(lack of) of her conditions at home" and provided a psychiatry referral. Tr. 618.

On April 6, 2020, a week after her date last insured, Hoover saw Nurse Case to discuss her medication. Tr. 776. She told Case that her mental health symptoms had worsened, and described feeling irritable, moody, anxious, and depressed, with racing thoughts and energy changes. Tr. 776. On exam, Hoover appeared anxious, was tearful, and exhibited a depressed mood. Tr. 776. She was alert, oriented, and cooperative during the exam. Tr. 776. She had good eye contact, judgment, and insight. Tr. 776. Hoover had no auditory or visual hallucinations and no suicidal ideations or delusions. Tr. 776. Her thought process was logical and goal-directed. Tr. 776. Hoover told Case that in the past her mental health medications hadn't helped "at all." Tr. 777. Hoover said that she couldn't get in to see Dr. Gehlot "for months" and that she couldn't

8

wait that long for help. Tr. 777. Case started Hoover on Prozac and Xanax and set a follow-up appointment for the following week. Tr. 777.

A week later, on April 15, Hoover told Case that she felt "much improved" and had no complaints. Tr. 774. She said that she felt better on Prozac than she had on other medications. Tr. 774. Hoover said that she had a virtual appointment with Dr. Gehlot in psychiatry in "a few weeks." Tr. 774. On exam, Hoover appeared happy, and was smiling and not tearful. Tr. 774. Her remaining exam findings were the same as her prior visit. Tr. 774.

On April 22, 2020, Hoover saw Dr. Gehlot. Tr. 3940. Hoover reported that Xanax "significantly helped her deal with how she was feeling. . . ." Tr. 3940. She denied depressive symptoms and said that Xanax helped her sleep well. Tr. 3940. She described feeling elated and at times irritable. Tr. 3940. She had racing thoughts and she spent money excessively. Tr. 3940. On exam, Hoover was restless and cooperative, with limited eye contact. Tr. 3945. She had pressured speech and was hyperverbal. Tr. 3945. Her mood and affect were irritable. Tr. 3945. Hoover was alert and oriented with no observed cognition or attention abnormalities. Tr. 3945. She had "improved" insight and judgment and racing thoughts. Tr. 3945. Dr. Gehlot assessed mild manic bipolar disorder with anxiety distress and anxiety disorder. Tr. 3945–46. Dr. Gehlot adjusted Hoover's medications and ordered a psychology evaluation. Tr. 3945–46.

On May 7, 2020, Hoover told Dr. Gehlot that she was "doing better," felt less irritable, and was sleeping well. Tr. Tr. 3966. Her thoughts had slowed

9

down, she was less distractable, and she wasn't engaging in impulsive or reckless behavior. Tr. 3966. She reported no depressive symptoms and said that her anxiety control had also improved. Tr. 3966. On exam, her speech was no longer pressured. Tr. 3966–67. The only positive exam findings were a restricted affect and mild, racing thoughts. Tr. 3966.

Two weeks later, Hoover reported improvements to Dr. Gehlot. Tr. 3969. On exam, her mood was "better," her affect was restricted, and she had mild racing thoughts. Tr. 3970. Dr. Gehlot increased Hoover's Seroquel dosage. Tr. 3971. In July 2020, Hoover saw Dr. Gehlot and denied experiencing symptoms. Tr. 3976. On exam, her mood was good, her affect was full and congruent, and her thoughts were unremarkable. Tr. 3976–77.

In September 2020, Hoover told Dr. Gehlot that because the increased Seroquel dosage was making her drowsy in the morning, she halved the 400 mg dosage and, as a result, was experiencing irritability and other symptoms. Tr. 3979. On exam, Hoover had a restricted affect, an anxious mood, "mild racing thoughts," and normal speech. Tr. 3980. Her remaining exam findings were unremarkable. Tr. 3980. Dr. Gehlot adjusted the Seroquel dosage to 300 mg. Tr. 3981. In November, Hoover's symptoms had increased, and Dr. Gehlot adjusted Hoover's medications. Tr. 3982–84.

In December 2020, Hoover was admitted to the hospital due to nausea, vomiting, and abdominal pain. Tr. 1859. Hoover reported her history of hospitalization for the same symptoms, and said that gastroparesis was ruled

10

out and that "no one can figure out what is wrong with her." Tr. 1859. "She state[d] she's been told to stop smoking marijuana as this can contribute to her symptoms but she has not." Tr. 1859.

In March 2021, about a year after her date last insured, Hoover was hospitalized for diabetic ketoacidosis and entered a skilled nursing facility, from which she was discharged sometime before July 2021. Tr. 695–99. The ketoacidosis caused extreme complications, including, at some point, an anoxic brain injury (lack of oxygen to the brain), which, in turn, caused cognitive and speech problems that were noted in August 2021, Tr. 2900, vision loss, and a severe leg wound that required amputation sometime after September 2021, Tr. 695–99, 1313, 3094, 3415. Hoover states that she applied for, and was awarded, supplemental security disability benefits beginning in early 2021. Doc. 10, at 4.

In December 2024, Nurse Case wrote a letter on Hoover's behalf regarding Hoover's mental functional capacity. Tr. 3415. Case stated that, from 2018 to 2021, Hoover "was a fragile diabetic with variable glucose readings," which frequently required her to stop working "to intervene" by eating or administering insulin. Tr. 3415. Case stated that Hoover suffered from bipolar disorder, panic disorder, generalized anxiety disorder, and moderate depression. Tr. 3415. Case wrote that "[w]ith her mood instability, decreased concentration, increased anxiety and panic, it would be difficult for [Hoover] to maintain a normal work schedule and normal productivity as her

11

peers." Tr. 3415. She opined that, before Hoover's March 2021 medical emergency, Hoover "would not have been able to hold a full time employment due to the severity of her diabetes type 1 … and her mental health." Tr. 3415.

The same day, Case completed a checkbox form indicating Hoover's ability to perform certain work tasks. Tr. 3413–14. Case opined that, based on Hoover's diabetes and mental health issues, Hoover could perform simple tasks, low-stress work, tolerate superficial and occasional contact with others, and would require extra reminders and assistance to perform work tasks. Tr. 1313. She could handle minimal workplace changes. Tr. 3413. Hoover would experience issues responding appropriately to "regular/normal" work criticism; be off-task at least 15 percent of the work-day, and miss more than three days of work per month. Tr 1313–14.

*State agency opinions*[7]

In December 2022 and March 2023, David Dietz, PhD, and Daniel Malone, PhD, respectively reviewed Hoover's record, including evidence starting in February 2019. Tr. 74–75; 83. The doctors found that Hoover's

---

[7]    When a claimant applies for disability benefits, the State Agency creates a record. The record includes the claimant's medical evidence. A State Agency disability examiner and a State Agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the State Agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the State Agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

depression and anxiety were severe impairments, but that there was insufficient evidence before March 2020, the date last insured, to evaluate the severity of these impairments. Tr. 75, 83.

*Hearing testimony*

Hoover, who was represented by counsel, and a vocational expert testified at the administrative hearing held in December 2024. The ALJ found that Hoover had no past relevant work. Tr. 61. The ALJ asked the vocational expert to determine whether a hypothetical individual with the same age, education, and work experience as Hoover could perform work if the individual had the limitations assessed in the ALJ's RFC determination, described below. Tr. 61. The vocational expert answered that such an individual could perform the following jobs—garment sorter, packager, and inspector. Tr. 61.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

> 1. The claimant last met the insured status requirements of the Social Security Act on March 31, 2020.
>
> 2. The claimant did not engage in substantial gainful activity during the period from her amended onset date of April 1, 2019 through her date last insured of March 31, 2020 (20 CFR 404.1571 *et seq*.), (7D).
>
> 3. Through the date last insured, the claimant had the following severe impairments: type 1 diabetes mellitus (20 CFR 404.1520(c)).
>
> 4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the

severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity[8] to perform light work as defined in 20 CFR 404.1567(b) except as follows: she could have frequently kneeled, crouched, and crawled. She could have occasionally climbed ramps or stairs, but never have climbed ladders, ropes, or scaffolds. Must have avoided all exposure to dangerous moving machinery and unprotected heights.

6. The claimant has no past relevant work (20 CFR 404.1565).

7. The claimant was … 27 years old, which is defined as a younger individual age 18–49, on the date last insured (20 CFR 404.1563).

8. The claimant has at least a high school education (20 CFR 404.1564).

9. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568).

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy the claimant could have performed (20 CFR 404.1569 and 404.1569a).

11. The claimant was not under a disability, as

---

[8] A residual functional capacity, or "RFC" is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it's the SSA's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

defined in the Social Security Act, at any time from April 1, 2019, the alleged onset date, through March 31, 2020, the date last insured (20 CFR 404.1520(g)).

Tr. 20–30.

### Standard for Disability

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4. What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next

15

step.

5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id*. "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id*. If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

**Standard of review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (citations omitted). The substantial evidence standard "is not high." *Id*. at 103. Substantial evidence "is 'more than

16

a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 587 U.S. at 99.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Discussion**

*1.      The ALJ did not err at step two when she evaluated Hoover's mental health impairments, and the ALJ considered Hoover's mental impairments when assessing the RFC*

Hoover argues that the ALJ erred "by failing to include [Hoover's] anxiety, bipolar, and/or depression as a severe impairment, and thereafter not

17

explaining why related non-exertional limitations were excluded from the final RFC." Doc. 10, at 8.

At step two of the sequential evaluation, the ALJ determines whether a claimant has a "severe" impairment. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). A *severe* impairment is one that significantly limits the claimant's physical or mental ability to do "basic work activities." *See* 20 C.F.R. § 416.920(c). An impairment is "not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243, n.2 (6th Cir. 2007) (quoting *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988)). When an ALJ finds *severe* and *non-severe* impairments at step two and continues with the subsequent steps in the sequential evaluation process, any error at step two is harmless. *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (the failure to find an impairment severe at step two is harmless error when the ALJ continues through the remaining steps of the evaluation and can consider non-severe impairments when assessing an RFC); *see Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) ("The fact that some of Anthony's impairments were not deemed to be severe at step two is…legally irrelevant" because the ALJ considered Anthony's severe and non-severe impairments in the remaining steps of the analysis) (citing *Maziarz*); *see also Hedges v. Comm'r of Soc. Sec.*, 395 (6th Cir. 2018). "After an ALJ makes a finding of severity as to even one impairment, the ALJ 'must consider the limitations and

18

restrictions imposed by *all* of an individual's impairments, even those that are not 'severe.'" *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (6th Cir. 2009) (quoting Soc. Sec. Rul. 96-8p, 1996 WL 374184, at *5).

At step two, the ALJ spent three pages discussing why she found that Hoover's depressive and anxiety disorders were not severe. Tr. 20–23. The ALJ explained that to make this finding, she determined that Hoover had no more than mild limitations in the four broad areas of mental functioning set out in the disability regulations and known as the "'paragraph B' criteria."[9] Tr. 22–23 (citing 20 CFR, Part 404, Subpart P, Appendix 1). Later in the decision, when the ALJ assessed Hoover's RFC, she recounted the reasons why Hoover said that she could not work, including her depression and anxiety. Tr. 25. The ALJ also evaluated Nurse Case's opinion regarding Hoover's mental limitations. Tr. 28. In other words, the ALJ considered Hoover's mental impairments at step two and when evaluating the RFC, as she was required to do. *See Maziarz*, 837 F.2d at 244.

In fact, the ALJ stated that she was required to follow Social Security Ruling 96-8p and consider Hoover's non-severe impairments when assessing the RFC. Tr. 19. This statement, along with the ALJ's extensive discussion at

---

[9] The "four broad functional areas" are a claimant's ability to "[u]nderstand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself." 20 C.F.R. § 404.1520a(c)(3) (citing 12.00E, 20 CFR, Part 404, Subpart P, Appendix 1). The degree of limitation is assessed using a five-point scale: "None, mild, moderate, marked, and extreme." § 404.1520(c)(4). A "none" or "mild" limitation generally equates with a non-severe impairment. § 404.1520(d)

19

step two about Hoover's non-severe mental impairments, Tr. 20–23, shows that the ALJ complied with the requirement to consider all of Hoover's impairments at later steps in the sequential evaluation. *See Emard v. Comm'r of Soc. Sec.,* 953 F.3d 844, 851–52 (6th Cir. 2020) (affirming when "the ALJ specifically noted in her summary of the applicable law that she was required to comply with SSR 96-8p's mandate to 'consider all of the claimant's impairments, including impairments that are not severe'" and discussed at step two the non-severe impairment).

Hoover complains that the ALJ didn't include any mental limitations in the RFC. Doc. 10, at 13–14. But she hasn't cited legal authority stating that the ALJ was required to include mental limitations in the RFC for mild, non-severe mental impairments. Legal authority indicates otherwise. *See, e.g., Zingale v. Kijakazi,* No. 1:20-cv-2197, 2022 WL 824148, at *12 (N.D. Ohio Mar. 18, 2022) (stating that an ALJ is not required to include in an RFC any limitations stemming from mild, non-severe mental findings at step two, collecting cases).

Next, Hoover complains that the ALJ failed to explain why she didn't include mental limitations in the RFC. Doc. 10, at 14; Doc. 12, at 1. But she hasn't shown that the ALJ was required to do so. The case she cites in support of her argument, *Richardson v. Saul,* 511 F. Supp. 3d 791 (E.D. Ky. 2021), is not on point. Doc. 10, at 13. In *Richardson,* the ALJ found that there were "no more than mild" mental limitations at step two; later in the decision gave

20

"great weight" to an opinion that assessed "mild to moderate" mental limitations; and provided no mental limitations in the RFC and no explanation as to why they were omitted. *Id.* at 798–99. Here, in contrast, the ALJ didn't find persuasive an opinion that found Hoover to have more than mild mental limitations. So the ALJ's decision wasn't inconsistent on that point, as was the ALJ's decision in *Richardson. Id.* at 799. Furthermore, in Hoover's case the ALJ discussed why she didn't find persuasive the mental limitations that Nurse Case assessed. Tr. 28. Hoover doesn't agree with the ALJ's rejection of Case's opinion, Doc. 10, at 14, 16, but as described more fully below, she doesn't show that the ALJ erred or that her decision was unsupported by substantial evidence.

Hoover says that the ALJ's decision was internally inconsistent because, she claims, at step two the ALJ found the state agency reviewers' opinion "'partially persuasive,' and then later said that they were 'persuasive.'" *Id.* at 15. But Hoover misreads the decision—the ALJ wasn't talking about the same opinion. The ALJ at step two found "partially persuasive" the state agency psychologists' opinion about her mental impairments, Tr. 22, and later found "persuasive" the state agency medical doctors' opinion about her physical impairments. Tr. 27. These findings were not internally inconsistent.

Hoover contends that the ALJ's mild findings in the four functional areas, Tr. 22–23, was internally inconsistent with her finding that Hoover's mental impairments did not significantly interfere with her abilities to engage

21

in work activity. Doc. 10, at 14–15; *see* 20 C.F.R. § 404.1522(a) (explaining that an impairment or combination of impairments "is not severe if it does not significantly limit your physical or mental ability to do basic work activities."). But the regulations expressly state that mild limitations in the four areas of functioning will generally result in a finding that a mental impairment is not severe. *See* 20 C.F.R. § 404.1520a(d)(1) ("If we rate the degrees of your [mental] limitation as 'none' or 'mild,' we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities[.]"). The ALJ's finding that Hoover had mild limitations in the four functional areas therefore was not inconsistent with the ALJ's finding that Hoover's mental impairments were not severe.[10]

Next, Hoover argues that the ALJ's review of the evidence was faulty. Doc. 10, at 15. She says that the ALJ "points to many normal findings in the

---

[10]  Hoover states that the ALJ's RFC assessment means that Hoover "would not be limited in performing higher executive functioning or skilled jobs, and that she can manage others without limitation." Doc. 10, at 15. Hoover fails to appreciate the sequential process. She repeatedly argues that the ALJ made a mistake at "step 4," *see, e.g., id.* at 1, 8, 12, but Hoover had no past relevant work (step four) so the ALJ moved to step five, Tr. 29. At step five, the ALJ "consider[s] [the] residual functional capacity and [the claimant's] age, education, and work experience to see if [the claimant] can make an adjustment to other work." 20 C.F.R. § 404.1520(a)(4)(v). Here, the ALJ at step five considered the fact that Hoover had a high school education and no transferrable job skills. Tr. 29, 61. The ALJ accepted the vocational expert's testimony that Hoover could perform unskilled work. Tr. 30, 61. So it's not clear why Hoover thinks that the ALJ found that she could perform highly skilled work or jobs involving "higher executive functioning."

22

examinations, while ignoring the abnormal ones during the same appointments." *Id.* But the ALJ recognized that Hoover at times had abnormal exam findings. Tr. 21 (ALJ stating that in November 2018, Hoover had a "hypomanic/anxious mood" and in December 2019, she had a flat affect and appeared anxious, citing Tr. 319, 2749), Tr. 22 (ALJ commenting that in April 2020, Hoover "displayed some symptoms, [but] her mental status examination remained generally unremarkable," citing Tr. 776). In other words, the ALJ recognized that Hoover at times had positive exam findings, but she also found that Hoover nevertheless maintained good attention, good or fair insight and judgment, unremarkable thought content and process, and intact memory. Tr. 21–22. The ALJ also commented that Hoover at times denied mental health symptoms or reported that they were under control, Tr. 21–22, and that due to her pregnancy she stopped taking mental health medication from February 2019 until December 2019. Tr. 21. When Hoover restarted her medications in early 2020 after feeling symptomatic, the ALJ noted, she reported improvement. Tr. 22 (citing Tr. 774).

Hoover cites transcript pages showing that she exhibited rapid speech during exams. Doc. 10, at 15 (citing 2742, 2745, 2749, 2753).[11] All of these treatment notes pre-date the April 1, 2019 alleged onset date. Tr. 2742 (April 2018), 2745 (September 2018), 2749 (November 2018), 2752–53 (December

---

[11] Hoover also cites Tr. 2759, but at that February 2019 visit Hoover did not have rapid speech.

2018). Regardless, these treatment notes also show certain unremarkable baseline exam findings consistent with what the ALJ found. Tr. 21; *see, e.g.*, Tr. 2742 (showing that Hoover had good attention and judgment, good-to-fair insight, unremarkable thought content, intact thought process and memory, and she was cooperative and oriented); 2745 (same); 2749 (same); 2752 (same). Hoover says that at times she was tearful. Doc. 10, at 15 (citing Tr. 477, 560). But both of the records Hoover cites were emergency room visits wherein Hoover was tearful due to her reported stomach pain, not from mental health symptoms. Tr. 477, 559–60. Hoover claims that "just as her [date last insured] was expiring she was admitted for inpatient care for four … days, due to issues with her mental health." Doc. 10, at 15 (citing Tr. 617–18, 774). This is not so— Hoover's cited records show that Hoover was hospitalized in March 2020 for diabetic ketoacidosis. Tr. 617. The other record she cites is a visit with Nurse Case, in which Hoover said that she felt "much better" after restarting mental health medications. Tr. 774.

Hoover suggests that her March 2020 diabetic ketoacidosis occurred because her mental health issues caused her to stop taking her diabetes medication, and submits that the ALJ ignored "this issue." Doc. 10, at 15–16 (citing Tr. 617–18, 774). Transcript page 774 does not say that Hoover stopped taking diabetes medication. Rather, the record states that Hoover reported feeling "much improved" after restarting mental health medication that she had stopped taking due to her pregnancy. Tr. 774. This doesn't show that

24

Hoover's mental health issues caused her to be non-complaint with medication. Transcript page 617 shows that the emergency room doctor who wrote Hoover's discharge summary from her diabetic ketoacidosis event wrote that it likely occurred due to "nonadherence to insulin pump (patient states it was malfunctioning?)(Also patient had poor oral intake at home and states her pump was temporarily shut off)." Tr. 617. The doctor also commented that Hoover said she had taken herself off two of her mental health medications since September 2019, Tr. 617, but no reason was given for Hoover having done so. The emergency room doctor referred Hoover to psychiatry, since she said she hadn't seen her psychiatrist "in a while," and wrote that he "suspected [Hoover's] bipolar disorder is playing a significant role in overall care/(lack of) … her conditions at home." Tr. 617–18. This emergency room provider's expressed suspicion, especially without knowing the context of Hoover's treatment history, does not show that Hoover's ketoacidosis was caused by her mental health symptoms. And it doesn't show that the ALJ ignored evidence or that her decision is unsupported by substantial evidence.

Hoover hasn't shown that the ALJ erred at step two, when finding that her mental health impairments were not severe, or that she failed to consider Hoover's mental health issues later in the decision when assessing Hoover's RFC.

25

2. *The ALJ did not err when she evaluated Nurse Case's opinion*

Hoover challenges the ALJ's evaluation of Nurse Case's opinion. Doc. 10, at 16. The ALJ explained:

> In December of 2024, the claimant's family care provider Cassandra L. Case, APRN, completed an opinion wherein she suggested the claimant's diabetes warranted interventions that would have caused interference in production performance at work and the inability to complete tasks. (14F/4). She also opined that symptoms from the claimant's mental impairments interfered with her ability to maintain a "normal work schedule and normal productivity as her peers". (Id.) Ms. Case did not propose any exertional limitations, but did opine the claimant could perform only simple work and tolerate superficial and occasional contact with others. (Id/2). She opined the claimant would require extra reminders/assistance to perform work tasks, and she would experience issues responding appropriately to regular/normal work criticism. (Id.) Collectively, Ms. Case opined the claimant would be off task fifteen percent or more of the workday and miss more than four days of work per month. (Id/3).
>
> The undersigned finds Ms. Case's opinion unpersuasive, as it was completed many years after the expiration of the claimant's insured status. Further, though she indicated she first started treating the claimant in 2018, she did not specify when the proposed limitations began. Even assuming the opinion covers the period beginning in 2018, as noted earlier, the mental health evidence of record does not suggest severe limitations prior to the expiration of the claimant's insured. During the period at issue, the claimant received only sporadic mental health care that consisted only of prescribed medication. She reportedly sometimes displayed depression and anxiety, but the remainder of her mental status examination yielded normal findings. Also, around the time her insured status expired, the claimant acknowledged significant improvement in

26

her mental health complaints.

Again, Ms. Case did not provide any specific exertional limitations related to the claimant's diabetes, instead suggesting her condition would have resulted in frequent time off work. (14F/4). Yet, Ms. Case acknowledged that an endocrinologist treated the claimant's diabetes, not her. She also referred to frequent fluctuations in the claimant's glucose reading from 2018-2021, but did not address the issue of non-compliance referenced throughout the record. Moreover, while not a material factor, the claimant's marijuana use contributed to the claimant's symptoms during the period at issue. Ms. Case also did not address this concern.

Finally, regarding any opinion the claimant was unable to sustain employment, these are issues reserved to the Commissioner of Social Security (20 CFR 404.1520b), and of no persuasive value.

Tr. 28.

Hoover objects to the ALJ's statement that Case didn't specify when her proposed limitations began. Doc. 10, at 17. She argues that Case's letter "specifically stated 'Based on my medical knowledge and clinical evidence of [Hoover] prior to her March 2021 medical emergency, she would not have been able to hold a full time employment due to the severity of her diabetes type 1 on a insulin pump and her mental health." *Id.* (citing Tr. 3415). While it is true that Case made this statement in her letter, she didn't cite this time-frame in her opinion setting forth Hoover's limitations. Tr. 3413–14. And whether Hoover could work full-time is an issue reserved for the Commissioner, 20 C.F.R. § 404.1520b(c)(3)(i), which the ALJ found, Tr. 28, and which Hoover concedes was "correct," Doc. 10, at 17. Moreover, as the ALJ accurately stated,

27

Case in her letter said that Hoover couldn't work "prior to her March 2021 medical emergency," which doesn't indicate when Case believed that Hoover's limitations began. And Hoover's medical emergency in March 2021 was one year *after* Hoover's date last insured. The ALJ's statement regarding the timeframe to which Case's opinion applied is accurate.

Next, Hoover complains about the ALJ's statement that Hoover's marijuana use contributed to her symptoms. Doc. 10, at 18. Hoover claims that this isn't "the full picture" and says that she had reported that marijuana helped with her nausea and vomiting. *Id*. Hoover may have reported this to providers, but the record shows that medical providers told Hoover to stop using marijuana because it made her gastrointestinal issues worse. *See, e.g.*, Tr. 617 (March 2020 emergency room record noting that Hoover's vomiting was caused in part by "cannabis induced hyperemesis and possibly gastroparesis" and that Hoover was "counseled extensively on [marijuana] cessation"), Tr. 1859 (December 2020 emergency room note saying that "[Hoover] states she's been told to stop smoking marijuana as this can contribute to her symptoms but she has not"). Hoover submits that the ALJ's "claim of noncompliance may actually have been related to issues using the insulin pump." Doc. 10, at 18 (citing Tr. 617). It's not clear what Hoover is trying to argue here—the medical record she cites says that Hoover's diabetic ketoacidosis was likely due to Hoover's "nonadherence to insulin pump." Tr. 617. The ALJ elsewhere in the

28

decision remarked that Hoover's diabetes "appeared controlled with compliant use of an insulin pump," Tr. 26, which Hoover does not outwardly dispute.[12]

Hoover's other arguments are unavailing. Hoover contends that even if she was non-complaint with diabetic treatment, "[i]t's obvious her ability to manage her brittle diabetes was out of her abilities, given her later major [diabetic ketoacidosis]." Doc. 10, at 19. She doesn't cite any records showing that her March 2021 diabetic ketoacidosis event was caused by her inability to manage her diabetes, or that, even if it was, this alleged situation existed before her last date insured of March 2020. Hoover argues that the ALJ didn't "reference, cite, or mention any of the mental health examinations that noted active psychiatric abnormalities," Doc. 10, at 19–20, but elsewhere in the decision the ALJ did, Tr. 21–22, and the ALJ wasn't required to re-cite them when discussing Case's opinion, *see Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016).

---

[12] Hoover cites five records that she says "recognized that she was actually a brittle diabetic, not just 'noncompliant.'" Doc. 10, at 18. Four of these records, Tr. 685, 1446, 3056, 3626, post-date her March 2021 medical emergency (including three from 2022), well after her date last insured. The only record from earlier than Hoover's March 2021 medical emergency that she cites is from December 2020—eight months after Hoover's date last insured. Tr. 1856. This emergency-room record shows that Hoover was treated for "active vomiting" and was "[c]ounsel[ed] regarding cessation of marijuana (not very receptive)." Tr. 1855. For her diabetes mellitus, Hoover was to continue her insulin pump and treatment protocol, and the note adds: "appreciate endocrine to manage brittle BGs with insulin pump." Tr. 1856. This note does not undercut the ALJ's finding that Hoover was non-compliant with treatment.

Hoover quotes Case's comments from treatment notes in an attempt to show that the ALJ "avoid[ed] … the truth," Doc. 10, at 20, but she provides no context for these records. And context matters here. The ALJ cited records showing the following treatment history: Hoover had improved on mental health medication and reported that her symptoms were under control by January 2019; in February 2019 she stopped taking mental health medication because of her pregnancy, continued to deny issues, and was observed to have normal exam findings; in December 2019, a few months after she gave birth, Hoover saw Case and reported mental health symptoms but said that she wanted to see Fior-Nossek for treatment; she didn't see Fior-Nossek and her symptoms worsened, so Case started Hoover on medication until she could see the provider she wanted; and Hoover reported improvement on this medication. *See* Tr. 21–22.

Finally, Hoover claims, in a footnote, that she had "issues with insurance and access to [some mental health] medications in 2018." Doc. 10, at 18 (citing Tr. 2743–45). But at this September 2018 visit, six months before Hoover's alleged onset date, any reported insurance issues effecting visits with Fior-Nossek had apparently been resolved. Tr. 2743, 2746. Indeed, at the administrative hearing, Hoover confirmed that there were no time periods that she was without health insurance. Tr. 46.

In all, Hoover has not shown that the ALJ erred when evaluating Nurse Case's opinion.[13]

**Conclusion**

For the reasons explained above, I recommend that the Court affirm the Commissioner's decision.

Dated: June 5, 2026

*/s/ James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–31 (6th Cir. 2019).

---

[13]  In a footnote, Hoover complains about the ALJ's evaluation of the state agency reviewers' opinions. Doc. 10, at 18. Because she has "fail[ed] to develop this argument further than this footnoted reference, it is forfeited." *See, e.g., United States v. Johnson*, 440 F.3d 832, 846 (6th Cir. 2006); *Taybron v. Liberty Mut. Pers. Ins. Co.*, 568 F. Supp. 3d 854, 860 (E.D. Mich. 2021) ("An argument set forth exclusively in a footnote is not properly presented for the court's review") (citation omitted).

31